## State Board of Charities and Corrections v. Hays, et al.

### Same v. Combs, et al.

(Decided November 5, 1920.)

## Appeals from Franklin Circuit Court.

1. Action—Misjoinder—Mandamus.—There is no misjoinder where only cause of action for mandamus is stated, although the prayer in addition to a judgment for mandamus asks for a judgment for money.

2. Statutes—Subjects and Title.—An act of the legislature which relates in both its title and body to more than one subject is wholly void under section 51 of the Constitution.

3. Statutes—Subjects and Title—Working Prisoners.—Chapter 36 of the 1916 Acts of the legislature relates to working all prisoners

in the state penitentiary within and without prison walls and to paying all of them a small per diem for their labor and every feature of the body of the act is specifically covered by the title. Held that labor and payments therefor are not unrelated subjects and the act is not violative of section 51 of the Constitution.

4. Pardon—Authority to Pardon, Reprieves, Remit Fines and Forfeitures.—The provision for the payment of prisoners a small per diem for their labors is not an encroachment upon the powers conferred upon the Governor by section 77 of the Constitution to remit fines and forfeitures, commute sentences, grant reprieves and pardons.

5. States—Certification of Amount Due Prisoners.—A provision in the act that "At the end of each month the board of prison commissioners shall certify to the auditor of public accounts the amount due each prisoner for that month, and he shall draw warrant on the state treasurer for the amount so certified" is an appropriation within the meaning of section 230 of the Constitution.

6. Statutes—Enrolled Bills—Impeachment.—An enrolled bill signed by the proper officers and approved by the Governor cannot be impeached by the journals of the house and senate.

7. States—Payment of Per Diem to Convicts—Board of Charities and Corrections.—The provision in an act of the legislature for the payment to convicts of a small per diem for their labors, subject to forfeiture for violations of rules of misbehavior, is a reasonable exercise of the police power of the state, which cannot be delegated to a board of prison commissioners.

8. States—Payment of Per Diem to Convicts.—The act provides that the board of prison commissioners shall provide rules and regulations for the payment of not less than five nor more than fifteen cents per day to each convict for his labor. Held that the payments are gratuities and not wages and may be granted or withheld or withdrawn by the legislature at any time before payment; and that the power conferred upon the board to determine by rules and regulations the amounts thereof within the prescribed limits is administrative and not legislative.

9. States—Payment of Per Diem to Convicts—Constitutional Law.— The proposed payments as rewards for obedience and service and looking to the reformation of the convicts are not within the inhibition of article 3 of the bill of rights that "No grant of exclusive, separate, public emoluments or privileges shall be made to any man or set of men except in consideration of public services."

10. Statutes—Repeal—Repugnancy.—An act will not be held to have been repealed by a later act by implication in the absence of clear repugnancy and where the same legislature by a still later act expressly repealed and re-enacted the original act.

11. Statutes—Repeal—Repugnancy.—Ordinarily the repeal and simultaneous re-enactment of substantially the same statutory provisions is to be construed not as an implied repeal of the

original statute but as a continuation thereof; but where the repeal and re-enactment of an act which authorized payment of gratuities could have had no other purpose except to withdraw gratuities which had been authorized but not paid under the original act and grant them anew such effect should be given the legislative action rather than so construe it that it would have been a vain and foolish thing.

12. Statutes—Convicts—Board of Charities and Corrections.—The only right conferred upon the convicts by either act was the right to a mandamus against the board of prison commissioners requiring them to carry out the mandatory provisions thereof.

13. Statutes—Repeal—Claim Under Existing Law.—Section 456 of the statutes which merely protects from repeal an accrued right or claim arising under an existing law is not applicable and cannot be invoked in behalf of a claim to a mere gratuity that is withdrawn before payment.

CHAS. I. DAWSON, Attorney General, and W. T. FOWLER, Assistant Attorney General, for appellant.

HAZELRIGG & HAZELRIGG, GUY H. BRIGGS and HOBSON & HOBSON for appellees.

OPINION OF THE COURT BY JUDGE CLARKE—Reversing.

These two actions by different groups of prisoners against the board now in control of the state penitentiaries seek by mandamus to enforce the mandatory provisions of section 7, chapter 36, Acts of 1916, being subsection 7 of section 3828a, Kentucky Statutes.

For defense upon the merits the board in both actions contends that the section of the act involved is unconstitutional for many reasons, and was repealed by a later act of the legislature.

Before considering these questions one of practice will be disposed of briefly.

The petitions state only a cause of action for mandamus but plaintiffs pray not only that a writ of mandamus be awarded them and other prisoners for whom they sue but also "for a judgment on behalf of them for all arrearages, for their costs, and all proper relief." Defendants insist that there is a misjoinder of actions, one for a mandamus and the other for money judgments, and that the court erred in overruling their motion to elect. A complete answer to this complaint is found in the fact that no cause of action is stated and no judgment could have been entered upon a default for any sum of money in behalf of any plaintiff. There is

therefore no misjoinder and the mere fact that plaintiffs prayed for more than they were entitled to recover upon the facts alleged in their petition is immaterial.

The act in question is said to be unconstitutional be-cause:

(a)    It relates to more than one subject.

(b)    It is an encroachment upon the pardoning power of the governor.

(c)    The money necessary to make it effective is not appropriated, but if so the act did not receive the number of votes necessary under the Constitution for its passage.

(d)    It delegates to the prison board legislative powers.

(e)    It confers special and exclusive emoluments upon individuals not in recognition of public service, and diverts taxes collected by the state to other than public purposes.

(a)    Section 51 of the Constitution provides in part: "No law enacted by the general assembly shall relate to more than one subject, and that shall be expressed in the title."

The act in question relates in its first six sections to working convicts outside of prison walls and upon the public roads, while section 7 provides for the payment of all convicts, whether employed outside of or within prison walls, of not less than five nor more than fifteen cents per day for their labor. The title specifically covers every provision of the act, so that the act if violative of section 51 of the Constitution is wholly void. Hind v. Rice, 10 Bush 528. This is necessarily true because one part of the body of the act cannot be saved rather than the other where both are covered alike by the title, as may be done where a portion of the body of the act alone is violative of this section of the Constitution. In the former case to hold one portion of the act rather than the other valid would require of the judiciary the selection of the subject matter of the act, upon a mere guess and without legislative guide to determine which, if either, of the two subjects would have been considered alone by the legislature. Upon the other hand where the body of the act contains a departure from a valid title, such portion of the act may be declared void and all that is pertinent to the title selected by the legislature may be enforced by the judiciary as a legitimate

exercise of legislative authority under its own selection of the subject matter of the enactment. In other words the selection of the subject matter of an act is a legislative and not a judicial prerogative..

We must therefore in this case either declare the act wholly void or wholly valid so far as section 51 of the Constitution is concerned, and hence cannot restrict our view alone to section 7 thereof, which provides for payment of all convicts in small part for their labor.

Thus considering the act, we find that by section 8 the board is given full power to provide means and methods of employing all convicts retained within prison walls; and by section 9 is empowered to lease a farm or farms and work the prisoners thereon. · Hence the act deals comprehensively in detail with where and how all prisoners shall be worked both inside and outside of prison walls, and not simply of working them upon the public roads. It treats of working some prisoners on the roads, others on farms and others within prison walls, and provides for the payment of all whether they labor on the roads of the state, or upon farms or within prison walls, a small per diem for their labor.

Certainly this is one comprehensive act dealing with the one subject matter of prison labor wherever performed; and unless labor and remuneration therefor are unrelated matters, the act treats of but one subject. Surely labor and pay therefor are not unrelated matters that must be dealt with in separate acts. Whether the legislature had the power to pay convicts for their labor is another matter to be hereinafter determined, but if it had that power it clearly could make the provision for paying all convicts therefor in an act which provided the method and means of employing all convicts.

We are therefore of the opinion the act is not violative of section 51 of the Constitution:

(b) Nor is it an encroachment upon the powers of the governor conferred by section 77 of the Constitution to remit fines and forfeitures, commute sentences, grant reprieves and pardons, etc. That this is true is apparent from the fact that the governor has no power whatever to grant pay to convicts for their labor or withhold same or prescribe methods or means for their labor; and may still, notwithstanding this act, exercise as fully as before his every power to remit forfeitures, commute sentences, grant reprieves and pardons for

any and all of the convicts. This act only affects prisoners to the extent they have not received executive clemency and subject to any such clemency that may be conferred upon them at any time.

(c) It is next contended the act violates section 230 of the Constitution in so far as it provides pay for convicts because there is no appropriation of money for the purpose.

Section 230 provides:

"No money shall be drawn from the state treasury except in pursuance of appropriations made by law."

Hence if it is true as contended that there is no appropriation of the funds necessary to pay convicts for their labor, so much of the act as provides therefor is void. However in section 7 of the act it is provided:

"At the end of each month the board of prison commissioners shall certify to the auditor of public accounts the amount due each prisoner for that month, and he shall draw warrant on the state treasurer for the amount so certified."

A similar provision for the payment of pensions to disabled Confederate veterans was held in Bosworth v. Harp, 154 Ky. 559, to be an appropriation within the meaning of this provision of the Constitution; and so too must we hold here.

It is also contended under this head that if the act does carry the necessary appropriation it is yet invalid because it did not receive the necessary majority of the entire membership of both branches of the legislature as required by section 46 of the Constitution. For proof of this assertion we are asked to look to the journals of the house and senate. But this we cannot do. The enrolled bill was signed by the proper officers and approved by the governor, and cannot be impeached by the journals. This is the settled law of this state and supported by the weight of outside authority though not unanimously. Lafferty v. Huffman, 99 Ky. 80; Commonwealth v. Shelton, 99 Ky. 122; Commonwealth v. Hardin County Court, 99 Ky. 190; Wilson v. Hines, 99 Ky. 228; O. & N. Ry. Co. v. Barclay, 102 Ky. 20; Taylor v. Beckham, 108 Ky. 300; Waller v. Murray, 21 R. 783; Stone v. Dispatch Co., 21 R. 1475; Zimmerman v. Brooks, 118 Ky. 101; Vogt v. Beauchamp, 153 Ky. 67. See also 25 R. C. L. 897; 32 L. R. A. (N. S.) 20 and note.

(d) It is next insisted that the act is invalid because it delegates to the prison board authority to fix the amount within certain limits that shall be paid to convicts for their labor. Before attempting to pass upon this contention we deem it expedient if not necessary to consider briefly the status of convicts and the character of the proposed payments, whether they are gratuities as contended by appellant or wages as contended by appellees. Originally at the common law felons were without civil rights or capacities of any kind. They could not own or inherit property during life nor be the means of its transmission after death. The extreme harshness of this conception was somewhat relaxed before the common law became a part of our law, and has been materially altered since until now the property rights of convicts in all respects save as to their labor are as secure and protected or enforced in the self same way as those of any other person. They may own, inherit and transmit property; they may sue and be sued. This change has not been effected by a single statute or decision, but is the result of constitutional, legislative and judicial recognition of successive steps in a slow but constant improvement in the public consciousness and attitude toward those of the community who have become wards of the state, as often as not, because they are unfortunate rather than vicious.

It is a radical change in the public policy of course to pay convicts, or their dependants, any part of the fruits of their labor, but not more so than other changes that have been effected in the public policy in reference to the property rights of convicts.

But does this act effect or even attempt a restoration to convicts of property rights in their labor, even if we assume the legislature under present constitutional restrictions had the power to do so? We are sure it does not.

It has been considered always and everywhere that the labor of convicts is the property of the state, and our whole constitutional and legislative structure so regards it. It is performed involuntarily and under duress as a punishment for crime and not voluntarily or pursuant to contract; and this conception is not altered in the least by the present act. So long as penitentiaries are maintained and persons are confined therein as a punishment for crime, the state must have and exercise

the right of imposing involuntary labor upon the inmates. The labor of the convicts cannot be the property of the state and of the convict at the same time. The state cannot impose its restraint upon the convict's liberty of action and also waive its right to his labor or recognize his right to contract for his services or to labor or not as he may elect. Any concession therefore to the convict with respect to his involuntary labor or the fruits thereof is necessarily a dispensation of legislative grace, and not a recognition of a property right in the convict to his labor. It necessarily follows then that the proposed payments are mere gratuities that may be granted or withheld or withdrawn at any time by the legislature, if indeed it has the power to grant them, and if it has this power it is certainly a legislative function that cannot be delegated to the prison board or other purely administrative agency.

Assuming therefore for the moment the legislature had the power to grant the proposed gratuities, does the act delegate that power to the board? It imperatively requires that the board shall provide rules and regulations by which all prisoners who labor for the state, or their dependants, shall be paid not less than five nor more than fifteen cents a day for their labor. Hence the legislature has determined for itself that all prisoners who labor for the state shall receive therefor at least five cents but not more than fifteen cents per day, subject however to forfeiture for violations of rules or other misconduct; and the question of pay or no pay has not been delegated to the board. It has, however, left to the board the decision between these narrow limits of the per diem that shall be paid.

The board may fix the per diem at five cents or fifteen cents or any intermediate amount as may appear to them wise, since the value of the labor is manifestly not the criterion for the determination of the per diem. The legislature has therefore delegated to the board only a limited power to determine the amount and conditions of forfeiture of the proposed payments. If this is a legislative function it is void but if administrative only it is valid. But what is the power that the legislature is attempting to exercise in part and to delegate in part to the prison board? As we shall hope to demonstrate later in this opinion it is the police power of the state and the proposed gratuities are rewards for obedi-

ence and service and look to the reformation of the convict.

Being in the nature of rewards and not compensation the exact amount that should be paid to the different convicts necessarily depends upon the quality of their obedience and service, or the very purpose of the enactment fails. The question of rewards or no rewards is therefore legislative, but the extent thereof within legislatively prescribed limits is purely administrative since it depends upon an application of the law to the facts of each instance of its application. For instance, the board administering the law, in the rules and regulations to be provided, may begin with the minimum reward for the first year of incarceration and increase same gradually to the maximum for continued submission to discipline and improvement in the qualities that make for good citizenship, or by some other like arrangement suggested by its experience in handling the convicts work out a system that will not only be for the good of the state but for the good of the convicts as well.

To accomplish the purpose in view some such latitude was necessarily left to the board in administering the law since exact rewards could not be dictated by the legislature in advance and without knowledge of the facts necessary for its application. We are therefore convinced that the legislature has exercised fully and completely the legislative power and has delegated to the board only such power as was essential to the administration of the law, and which could not have been more narrowly restricted without defeating the very purpose of the enactment.

(e) The next contention is that the act is violative of that part of section 3 of the Bill of Rights which declares that:

"No grant of exclusive, separate public emoluments or privileges shall be made to any man or set of men except in consideration of public services."

We have just said that the payment of a convict for his labor in whole or in part is a dispensation of legislative grace, a mere gratuity (and not a wage) that may be granted or withheld or withdrawn by the legislature at any time. It is from this very premise that counsel for the board argue that such payments are also in violation of this constitutional provision. But granting the premise we are convinced the conclusion is unsound.

Webster's New International Dictionary defines emolument as, "Profit from office, employment or labor; compensation; perquisites, fees or salary."

The proposed payments therefore may be in a sense emoluments and, being paid out of public funds, public emoluments. But if so, instead of being exclusive or separate they are inclusive rather, since the act in question only extends to convicts in a measure and as a gratuity what everybody else under the government enjoys in full measure and as a right, except as sometimes limited of public necessity; that is, reward for labor performed for the public.

That the labor is performed for the public when the public to the exclusion of the laborer, gets all the fruits thereof surely will not be denied; but is labor performed by a convict for the public in expiation of his crime a public service? In a way it is, but probably not in the sense "public service" is used in the Bill of Rights. Neither do we consider the proposed payments "exclusive, separate public emoluments" as that term is used in the Bill of Rights.

The way in which the labor performed by a convict is a public service, and a distinct one we think, and for which only the payments are to be made, is when it is performed in such manner as to improve not only the discipline among prisoners but also the capacity of the prisoners for restored citizenship. And from such a service the state may reasonably anticipate, in addition, a very material advantage to itself in the shape of an increase in the prisoners' efficiency as laborers and a correspondingly larger yield from their labors.

We are convinced however that this constitutional inhibition was never intended to reach and does not in fact touch the question before us. Clearly these payments are made to stimulate the prisoner to render a better service and a better obedience during his necessary confinement and look to his reformation and are therefore an exercise of the police power inherent in sovereignty and a necessary attribute of every government.

This statute is of exactly the same general character as are statutes which hold out to convicts the chance of parole and credits for good conduct. They all adopt the idea of rewards rather than punishments as a means not only of enforcing discipline but also and

of greater importance of fitting the prisoners for restored citizenship. The penitentiary is no longer regarded as merely a place for the infliction of a deserved punishment upon criminals but is more justly and humanely appraised as an institution for the redemption of the morally and intellectually defective wards of the state. Actuated by this more enlightened conception of its duties to this class of its wards, the state has furnished at much expense chaplains for their spiritual and moral instruction; doctors and nurses for the conservation and improvement of their physical being, and schools of every character to eradicate not only illiteracy and inefficiency but other causes of crime in order that the one time criminal and charge upon the state upon his liberation from confinement may be properly equipped spiritually, physically, mentally and morally for the duties of good citizenship and to avoid a return to crime.

The state is learning by experience that this is the better plan in the management of its wards just as many a parent has learned that kindness and rewards rather than harshness and punishments procure a more willing obedience to reasonable and necessary regulations and at the same time improve both the parent and the child. Certainly the results hoped for justify the effort and any incidental expense that the state may incur. And surely such an effort is a reasonable exercise of the police power of the state.

We are therefore clearly of the opinion that the proposed payments are not for any of the reasons assigned unconstitutional.

2.   We come now to a consideration of whether the act has been repealed. It is insisted that this was twice done by the legislature at its 1920 session, once by implication and later by express provision.

The provisions of section 4 of chapter 7 of the 1920 Acts approved March 9, 1920, are relied upon as a repeal by implication of the provision of the 1916 act for payments to prisoners for their work. There is, however, in our judgment no repugnancy in the two provisions. We need not assign our reasons for so believing, since the legislature has indicated very clearly that it did not intend by any of the provisions of the act of March 9, 1920, to repeal the provisions for payment of convicts in the act of 1916. Nor did the legislature that passed this act attribute any such force to it because

later in the same session it expressly repealed and re-enacted the act of 1916, by chapter 159 of the 1920 session acts. We should not therefore attribute by implication to the earlier act of the 1920 session a force which the same legislature did not ascribe to it.

This leaves only for consideration the effect if any upon the act of 1916 of its repeal and re-enactment at the 1920 session of the legislature. Ordinarily it is the rule, as stated in 36 Cyc. 1084, that the "repeal and simultaneous re-enactment of substantially the same statutory provisions is to be construed not as an implied repeal of the original statute but as a continuation thereof." Under this rule it is insisted by appellees that there was not a withdrawal by the new act of the gratuity granted by the old act, but rather a continuation thereof; that there was no break whatever in the force and effect of the old act.

For the appellants it is argued that the repeal of the old act by the new one was a withdrawal of the gratuity and a new grant thereof from the effective date of the new act.

Conceding the soundness ordinarily of the rule above quoted from Cyc., we do not consider it applicable to the peculiar facts of this case. When the old act was enacted the penitentiaries were governed by three commissioners appointed by the governor, by and with the advice of the senate, and designated as the board of penitentiary commissioners. In an effort to improve the management of the penitentiaries and other eleemosynary institutions by placing all under one management the legislature at its 1918 session created for the purpose a board to be composed of five members and designated the state board of control. The board of penitentiary commissioners was abolished and all of its duties imposed upon the newly created board. In a further effort to improve the management of these institutions by taking same out of politics the legislature in the early part of its 1920 session abolished the board of control and created in lieu thereof a board of eight members, two of whom were to be women and not more than four of whom to be of the same political party and called the state board of charities and corrections, upon which was conferred all of the duties and powers of the board of control.

It was the board of penitentiary commissioners that under the act of 1916 was required to provide the rules and regulations for the payment to prisoners of a small per diem for their labor. Neither this board nor its successors had performed this service and this feature of the act had never become effective.

After creating the state board of charities and corrections and placing the penitentiaries in its charge, the legislature later in its 1920 session repealed and re-enacted, as we have stated before, the act of 1916. The only change made was the substitution of the name of the state board of charities and corrections for that of the older abolished board wherever the latter occurred in the old act. The purpose of the legislature in thus repealing and re-enacting the old act could not have been merely to impose upon the newly created board in charge of the penitentiaries the duty of providing rules and regulations for the proposed payments to prisoners, since in each instance all of the duties, privileges and powers of the abolished board were specifically conferred upon the newly created board.

The legislature knew this when it repealed and re-enacted the 1916 act, and it also knew of course that this authority to pay prisoners had never been exercised by any of the several boards that had possessed it. Unless therefore the legislature meant, by the act which repealed and re-enacted the 1916 act, that the duty successively imposed upon the old and new boards of providing rules and regulations for the payment of prisoners for their labor should be withdrawn and begin anew with the effective date of that act, it would be a wholly foolish and vain thing. No other possible force or meaning can be ascribed to it. We are therefore constrained to hold that this act was a withdrawal of the gratuities which had been authorized but which had never been claimed or paid under the act of 1916, and a new and separate grant of authority to the new board to pay similar gratuities. Such must have been the intention of the legislature, and this it clearly had the right to do at any time before the proposed gratuities were actually paid and certainly before they were even claimed or the necessary rules and regulations had been provided under which same were to be paid. Being gratuities merely, appellees never had a vested interest in or a contractual right to same, or any enforcible claim

thereto arising under the 1916 act. The only enforcible claim or right that was conferred upon them by the act of 1916 or the act of 1920 was and is the right to require the proper board to provide rules and regulations for the payment of gratuities to them, just as they are doing by these actions. Section 456 of the statutes, which merely protects from repeal among other things an accrued right or claim arising under an existing law, is therefore not applicable here. .

The new act did not contain an emergency clause and was neither approved nor disapproved by the governor. It became effective therefore under section 55 of the Constitution ninety days after the final adjournment of that session of the legislature or the latter part of June, 1920. The actions were instituted on the 26th day of March, 1920; the answers were filed on the 30th day of April and the judgments appealed from were entered on the 8th day of May, 1920, all before the act became effective under which alone plaintiffs are now entitled to a mandamus against appellants. But since, however, the new act which alone repealed the 1916 act under which they were proceeding and then had the right to proceed for mandamus against appellants, did not become effective until after the judgments in their favor were entered, it results that they were then as now entitled to the mandamus granted them, then under the old act and now under the new act. The judgments of the lower court should therefore we think be reversed, but at appellant's costs in this and the lower court, and for proceedings consistent herewith.

It is so ordered.