**2025 IL 130539**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

---

(Docket No. 130539)

PIASA ARMORY, LLC, Appellee, v. KWAME RAOUL, in His Official Capacity as Attorney General of the State of Illinois, Appellant.

*Opinion filed April 24, 2025.*

JUSTICE ROCHFORD delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Neville, Cunningham, and O'Brien concurred in the judgment and opinion.

Justice Holder White specially concurred, with opinion.

Justice Overstreet dissented, with opinion.

## OPINION

¶ 1    Section 2-101.5 of the Code of Civil Procedure (Code) (Pub. Act 103-5, § 2 (eff. June 6, 2023) (adding 735 ILCS 5/2-101.5)) sets venue in Sangamon and Cook

Counties for actions seeking declaratory or injunctive relief from a constitutional challenge to a state statute, rule, or executive order. The circuit court of Madison County ruled that the statute was unconstitutional as applied to individuals residing or injured outside of those two counties. For the reasons that follow, we reverse the judgment of the circuit court.

¶ 2                                    I. BACKGROUND

¶ 3        Plaintiff, Piasa Armory, LLC, a firearms dealer in Madison County, filed suit there in August 2023 against Illinois Attorney General Kwame Raoul. Plaintiff alleged that section 2BBBB of the Consumer Fraud and Deceptive Business Practices Act (commonly known as the Firearms Industry Responsibility Act) (Act) (Pub. Act 103-559, § 5 (eff. Aug. 14, 2023) (adding 815 ILCS 505/2BBBB)) was unconstitutional because it was preempted by federal law (count I), was void for vagueness (count II), violated the second amendment (U.S. Const., amend. II) (count III), and violated the three-readings rule of article IV, section 8, of the Illinois Constitution (Ill. Const. 1970, art. IV, § 8) (count IV). Plaintiff also alleged that section 2-101.5, the venue provision at issue here, was unconstitutional because the statute violated federal due process rights (count V).

¶ 4        The Attorney General moved to transfer the case to Sangamon County under section 2-101.5(a). See Pub. Act 103-5, § 2 (eff. June 6, 2023) (adding 735 ILCS 5/2-101.5(a)).[1] In response, plaintiff sought summary judgment on the question of venue. It submitted affidavits from its counsel and owner, who both stated that Madison County was a convenient forum due to a 30-minute drive to the courthouse, whereas Sangamon County was an inconvenient forum because it required a 90-minute drive. Plaintiff's owner added that most of his employees lived in Madison County.

¶ 5        The circuit court denied the Attorney General's motion to transfer and granted plaintiff's motion for summary judgment on count V. It stated as follows. The only Illinois precedent addressing whether a statute fixing venue violated a litigant's due

_____

[1]Because the Attorney General sought to transfer venue to Sangamon County and plaintiff raises an as-applied challenge, we focus our analysis on Sangamon County rather than Cook County, which is not relevant to plaintiff's claim.

process rights was *Williams v. Illinois State Scholarship Comm'n*, 139 Ill. 2d 24 (1990). Plaintiff was like the student loan borrowers who prevailed in *Williams* because plaintiff had "demonstrated that both Sangamon and Cook Counties are inconvenient forums." As applied to plaintiff, transferring the action to Sangamon County would deprive plaintiff of its ability to advance its best challenge to section 2BBBB of the Act's constitutionality. The parties would likely disagree about the facts of the case and require a trial. Plaintiff's counsel and owner submitted affidavits stating that Madison County was convenient whereas Sangamon County was not. Although plaintiff's representatives and witnesses could travel to Sangamon County, "the issue at hand pertains to reasonableness and convenience, not mere physical capability."

¶ 6        In response to the Attorney General's argument that plaintiff could participate in remote proceedings in Sangamon County, the circuit court stated that the Attorney General could participate remotely in Madison County. The court further opined that not everyone had the capability of appearing remotely and that, in the court's experience, "complex factual matters requiring documentation are best dealt with in-person." The circuit court determined that the factors set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), strongly disfavored transfer. Although plaintiff framed its constitutional challenge in terms of its own specific circumstances, the circuit court more broadly concluded that section 2-101.5 was unconstitutional as "applied to residents outside of Cook or Sangamon County, as well as individuals injured outside of Cook or Sangamon County."

¶ 7        Finally, the circuit court addressed plaintiff's argument, first raised in its motion for summary judgment, that section 2-101.5 violated the Illinois Constitution's three-readings rule. The circuit court stated that it was required to follow supreme court precedent foreclosing such challenges under the enrolled bill doctrine.

¶ 8        The circuit court entered a finding under Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) that there was no just reason to delay enforcement or appeal of the order. The Attorney General appealed the summary judgment order directly to this court under Illinois Supreme Court Rule 302(a) (eff. Oct. 4, 2011) and Rule

304(a) (eff. Mar. 8, 2016).[2] We allowed the Illinois Trial Lawyers Association to file an *amicus curiae* brief in support of the Attorney General's position. We also permitted the Illinois Defense Counsel, DRI Center for Law and Public Policy, and the Illinois Manufacturers' Association *et al.* to file *amicus curiae* briefs[3] in support of plaintiff's position. See Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).[4]

¶ 9                                II. ANALYSIS

¶ 10        "[F]rom the earliest history of this State, and under three different constitutions, the legislature has always assumed and exercised the power of determining the venue of transitory actions." *Mapes v. Hulcher*, 363 Ill. 227, 230 (1936); see *Chappelle v. Sorenson*, 11 Ill. 2d 472, 476 (1957) (the issue of venue is within the legislature's province). Through section 2-101 of the Code (735 ILCS 5/2-101 (West 2022)), the legislature has generally limited venue to either the county of residence of any defendant joined in good faith or the county in which the transaction or some part of the transaction that gave rise to the action occurred. Section 2-101's purpose is to provide a forum that is convenient to either the defendant, by selecting the county of his residence, or to witnesses, by litigating the case where the transaction occurred. *Williams*, 139 Ill. 2d at 40. Statutory venue requirements are procedural and define only where the case will be heard; they have no relation to the question of jurisdiction, which relates to a court's power to decide a case's merits. *Slepicka v. Illinois Department of Public Health*, 2014 IL 116927, ¶ 41; *Williams*, 139 Ill. 2d at 40. Accordingly,

---

[2]Plaintiff filed a notice of cross-appeal regarding whether section 2-102.5 violated the three- readings rule of the Illinois Constitution. The Attorney General moved to dismiss the cross-appeal for lack of jurisdiction, and this court granted the motion.

[3]The Illinois Defense Counsel and DRI Center for Law and Public Policy filed a joint brief. Joining the Illinois Manufacturers' Association in its brief were the Illinois Retail Merchants Association, Chicagoland Chamber of Commerce, Chemical Industry Council of Illinois, Illinois Coalition for Legal Reform, ISMIE Mutual Insurance Company, Illinois Insurance Association, National Association of Manufacturers, American Tort Reform Association, and American Property Casualty Insurance Corporation.

[4]The Illinois Trial Lawyers Association argues in favor of abandoning the doctrine of intrastate *forum non conveniens*, and the remaining *amici* argue in favor of preserving the doctrine. That subject is not at issue in this appeal, so we do not address it.

"[b]ecause venue is merely a matter of procedure, courts generally cannot interfere with the legislature's province in determining where venue is proper [citation], unless constitutional provisions are violated. [Citations.] Most courts, therefore, simply defer to the legislature when dealing with the validity of a particular venue statute [citations], and are generally loath to declare such statutes void." *Williams*, 139 Ill. 2d at 41-42.

Still, a statute fixing venue may be so arbitrary or unreasonable that it deprives a defendant of due process. *Id.* at 42; *Mapes*, 363 Ill. at 231.

¶ 11      At issue in the instant case is section 2-101.5 of the Code, which provides:

"(a) Notwithstanding any other provisions of this Code, if an action is brought against the State or any of its officers, employees, or agents acting in an official capacity on or after the effective date of this amendatory Act of the 103rd General Assembly seeking declaratory or injunctive relief against any State statute, rule, or executive order based on an alleged violation of the Constitution of the State of Illinois or the Constitution of the United States, venue in that action is proper only in the County of Sangamon and the County of Cook.

(b) The doctrine of forum non conveniens does not apply to actions subject to this Section.

(c) As used in this Section, 'State' has the meaning given to that term in Section 1 of the State Employee Indemnification Act.

(d) The provisions of this Section do not apply to claims arising out of collective bargaining disputes between the State of Illinois and the representatives of its employees." Pub. Act 103-5, § 2 (eff. June 6, 2023) (adding 735 ILCS 5/2-101.5).

¶ 12      The question before us is the constitutionality of section 2-101.5 as it applies to plaintiff. We presume that statutes are constitutional and must construe them to uphold their constitutionality if reasonably possible. *State ex rel. Leibowitz v. Family Vision Care, LLC*, 2020 IL 124754, ¶ 75. The party challenging the statute's constitutionality has the heavy burden of clearly establishing a constitutional

violation. *Rowe v. Raoul*, 2023 IL 129248, ¶ 20. Determining a statute's constitutionality presents a question of law that we review *de novo*. *Id.* We also review *de novo* the grant of a motion for summary judgment. *Davis v. Yenchko*, 2024 IL 129751, ¶ 16.

¶ 13    We initially examine the State's contention that the circuit court effectively found section 2-101.5 facially unconstitutional by ruling that the statute violated the due process rights of all individuals who reside or were injured outside of Cook and Sangamon County. The State contends that the ruling invalidates the statute in every case where it would otherwise be enforced. We note that a party raising a facial challenge must show that the statute is unconstitutional under any possible set of facts, whereas a party raising an as-applied challenge must establish that the statute is unconstitutional as it applies to the party's particular facts and circumstances. *Kopf v. Kelly*, 2024 IL 127464, ¶ 22. A successful facial challenge voids the statute, but in a successful as-applied claim, the party may enjoin the statute's enforcement against only himself. *Id.*

¶ 14    Here, plaintiff framed its claim in terms of its individual circumstances, but the circuit court broadened its ruling to encompass everyone residing or injured outside of the two named counties. The fact that the circuit court's ruling encompassed more than just plaintiff was not a *de facto* declaration that the statute was facially unconstitutional. In fact, plaintiff and the circuit court expressly acknowledged that the statute would be constitutional in certain applications, which would defeat a facial challenge. By definition, an as-applied constitutional claim depends on the particular facts and circumstances of the party asserting the claim (*id.* ¶ 23), so an examination of plaintiff's particular situation remains paramount. See *People v. Gray*, 2017 IL 120958, ¶ 58 (in an as-applied challenge, we exclusively examine the facts of the case before us and not any set of hypothetical facts under which the statute might be unconstitutional).

¶ 15    This court has declared a venue statute unconstitutional only once, in a 4 to 3 decision in *Williams*. There, individuals residing outside of Cook County who had defaulted on Illinois Guaranteed Student Loans brought a class action lawsuit against the Illinois State Scholarship Commission. *Williams*, 139 Ill. 2d at 28. They alleged, among other things, that a statute designating Cook County as the exclusive venue for all cases involving delinquent and defaulted student loans violated their

due process and equal protection rights. *Id.* We applied the balancing test enunciated in *Mathews*, 424 U.S. at 335, which requires consideration of (1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of the interest through the procedures used and any value of additional or substitute procedural safeguards, and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the new procedural requirements would entail. *Williams*, 139 Ill. 2d at 32-33. "By weighing these factors, courts can determine whether the government has met the fundamental requirements of due process—the opportunity to be heard at a meaningful time and in a meaningful manner." *In re Robert S.*, 213 Ill. 2d 30, 49 (2004); see *City of Los Angeles v. David*, 538 U.S. 715, 717 (2003). " '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' " *Mathews*, 424 U.S. at 334 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

¶ 16        In *Williams*, we examined the first *Mathews* factor in terms of the students' right of meaningful access to the courts. *Williams*, 139 Ill. 2d at 42-44. We stated that the students were effectively deprived of this right through the venue statute and the scholarship commission's practice of obtaining defaults and initiating postjudgment proceedings. *Id.* at 45. It was "not just the arbitrariness of establishing venue in Cook County that infringe[d] [the students'] right of access to the courts" but also that the defendants "refused to offer class members any alternative means of dispute settlement outside the courtroom, while vigorously pursuing default judgments against them in a distant forum." *Id.*

¶ 17        For the second *Mathews* factor, we concluded that class members who had a defense could be erroneously deprived of their property or liberty. *Id.* at 49. We stated that the additional procedural safeguard of an alternate forum would protect the students' right of access to the courts and avoid a conflict between the general venue law and the venue statute at issue. *Id.* at 58.

¶ 18        Regarding the third *Mathews* factor, we stated that the State's interest in efficiency and decreased expense was "not strong" because nearly half of the collection suits would occur in Cook County anyway per the general venue statute, based on population. *Id.* at 60-61. The record also did not indicate that filing the collection suits in other counties would require more effort or time than doing so in

Cook County. *Id.* at 61. We observed that it would be more efficient and arguably cheaper to try the cases where the witnesses and evidence were located. *Id.* at 62. This court further noted that the Attorney General, who legally represented the defendants, had satellite offices throughout the State and regularly litigated in all Illinois counties. *Id.*

¶ 19    In conclusion, we stated:

> "We admit that, standing alone, requiring venue to be in a particular county does not necessarily infringe upon [the students'] right of access to the courts. However, the burden of an inconvenient forum, when combined with the indigence of the class members, the combined evidence of [the agency's] lack of good faith in allegedly offering nonlitigious means of settling its claims against student borrowers and defendants' vigorous pursuit of default judgments against class members, and the statute's lack of provisions for an alternative forum, leads us to conclude that section 30-15.12 and defendants' practices effectively deprive plaintiffs of any means of defending themselves in these actions. This raises their personal interest to the level of a due process deprivation. [Citation.] A class member with a legitimate defense faces the very real risk of an erroneous deprivation, and the simple addition of provisions for an alternative forum would remedy any denial of the right of access and the risk of erroneous deprivation. These factors, considered against the weight of the weak governmental interest in exclusively limiting these collection suits to a Cook County forum, lead us to conclude that both the venue provision of section 30-15.12 and [the agency's] practice of filing all its collection actions in Cook County violate due process of law." *Id.* at 63.

Last, we rejected the defendants' arguments that filing the suits in Cook County was proper under the general venue statute, and we additionally determined that the defendants' use of contractual venue waiver or forum selection clauses was contrary to public policy. *Id.* at 67-73.

¶ 20    In the instant case, the circuit court largely considered the "convenience" of Madison County and the "inconvenience" of Sangamon County as a forum for plaintiff in determining that the first two *Mathews* factors weighed heavily in

- 8 -

plaintiff's favor. The relative convenience of each forum is central in considering a motion filed pursuant to the equitable doctrine of *forum non conveniens*. *Tabirta v. Cummings*, 2020 IL 124798, ¶ 18. However, a *forum non conveniens* motion "seeks to move the action from one forum with proper venue to another, more convenient forum with proper venue." *Id.* The doctrine of *forum non conveniens* may therefore be applied only when there is more than one proper venue. It is not the correct test here, where the question is whether a statute limiting venue for certain types of constitutional actions against the State violates a plaintiff's due process rights. We further note that section 2-101.5(b) explicitly states that "[t]he doctrine of forum non conveniens does not apply to actions subject to this Section." Pub. Act 103-5, § 2 (eff. June 6, 2023) (adding 735 ILCS 5/2-101.5(b)).

¶ 21        Plaintiff argues that it should be able to file its action where it was damaged and where section 2BBBB of the Act will be enforced against it.[5] Plaintiff asserts that requiring travel to Sangamon County will deprive it of the opportunity to effectively use the courts. According to plaintiff, "[i]t is not merely a trial that must be held in these counties, it is the preparation of an entire case for trial, and actually presenting it." Plaintiff also points to increased travel for witnesses. It further contends that constitutional cases are generally brought by the poor, including people accused of crimes that they did not commit, and they should not have the added roadblocks of traveling to strange places or having to invest in new technologies.

¶ 22        Section 2-101.5 is part of the Code of Civil Procedure and does not pertain to criminal cases or to any cases brought by the State. Additionally, it does not apply to all constitutional claims but rather only those actions seeking declaratory or injunctive relief based on a constitutional challenge to a state statute, rule, or executive order. Plaintiff cites no support for its assertion that most of these types of cases are brought by indigent litigants. More significantly, we emphasize that, in an as-applied constitutional challenge, we examine the specific facts and circumstances of the party asserting the claim. *Kopf*, 2024 IL 127464, ¶ 23. Accordingly, we assess the statute as it applies to plaintiff, a business entity in

---

[5]Plaintiff essentially seeks to apply the general venue statute. We observe that the only viable substitute procedural safeguard to consider as an alternative to section 2-101.5 is to revert back to the general venue statute.

Madison County, and not as it may apply to hypothetical plaintiffs in other situations.

¶ 23    Plaintiff's underlying case is a facial constitutional challenge of section 2BBBB of the Act. It will therefore most likely be resolved without a trial and thus without the need for witnesses to travel to any courthouse, as well as without much, if any, documentary evidence. As for the additional driving time for counsel, even in a *forum non conveniens* analysis, counsel's location is given little weight. *Fennell v. Illinois Central R.R. Co.*, 2012 IL 113812, ¶ 40. Moreover, counsel has the option to appear remotely for hearings, and witnesses may appear remotely under certain circumstances as well. See *First American Bank v. Guerine*, 198 Ill. 2d 511, 525-26 (2002) ("the convenience of the parties depends in large measure upon the context in which we evaluate their convenience" given the "smaller world" we live in today). Illinois Supreme Court Rule 45(c) (eff. Jan. 1, 2023), which governs remote appearances in circuit court proceedings, states that in civil matters "[c]ase participants shall be permitted to attend court via the circuit court's available remote appearance technology without any advance approval," except for certain types of proceedings such as evidentiary hearings and trials, which "require the approval of the judge presiding over the matter." See Ill. S. Ct. R. 206(h) (eff. Oct. 1, 2021) (permitting remote depositions by electronic means); R. 241 (eff. Feb. 2, 2023) (requirements for remote hearings in civil trials and evidentiary hearings). The Illinois Supreme Court Policy on Remote Court Appearances in Civil Proceedings states that the "widespread popularity of mobile telephones, particularly smartphones and other personal devices, means that more people than ever before have the ability to participate in court proceedings electronically from a location outside of court." Ill. S. Ct., Illinois Supreme Court Policy on Remote Court Appearances in Civil Proceedings 2 (eff. May 2020), https://www.illinois courts.gov/Resources/77204d09-8367-4b2b-994e-5f1a39644da8/ATJ_ Commission_Policy_on_Remote_Court_Appearances_in_Civil_Proceedings.pdf [https://perma.cc/2REL-WP4S]. The policy advises that "courts should permit Remote Court Appearances to the extent reasonable, feasible, and appropriate." *Id.* We note that, even in this case, the circuit court conducted the hearing on the State's motion to transfer venue and plaintiff's motion for summary judgment remotely via Zoom.

¶ 24 Turning to the government's interest, the State highlights the deference courts give to the general assembly's choice of venue. It additionally argues that the legislature reasonably set venue in counties that house state government when litigants seek to challenge governmental action in cases that primarily raise questions of law. The State contends that the statute is consistent with the general rule that venue is proper in a defendant's home county. The State cites a litany of statutes setting venue in Sangamon County or Sangamon and Cook County for cases seeking judicial review under the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2022)). It maintains that section 2-101.5 promotes the efficient and just adjudication of cases with constitutional importance by reducing the likelihood of conflicting opinions on significant state law questions, while having the cases adjudicated by courts most experienced in public law issues.

¶ 25 We conclude that the State has some interest in consolidating actions in certain counties, especially in light of recent statewide litigation asserting duplicative constitutional claims. See, *e.g.*, *Rowe*, 2023 IL 129248, ¶ 9 ("[s]ubsequently, additional state's attorneys and sheriffs filed lawsuits in other counties throughout the state, all of which raised essentially the same constitutional challenges" to amendments to the pretrial detention and release laws). Having the litigation brought in two counties would make the process of resolving the disputes more efficient and less costly for the State. See *Mathews*, 424 U.S. at 348 ("conserving scarce fiscal and administrative resources is a factor that must be weighed"). Still, the State's interest is not extremely strong given that the Attorney General's office was previously able to manage the litigation under general venue principles. As we observed in *Williams*, the Attorney General has satellite offices throughout Illinois and routinely litigates in every county in the state. *Williams*, 139 Ill. 2d at 62.

¶ 26 Balancing all of the *Mathews* factors ultimately yields the conclusion that section 2-101.5 is not unconstitutional as applied specifically to plaintiff because requiring plaintiff to litigate in Sangamon County does not deprive it of the opportunity to be heard at a meaningful time and in a meaningful manner. The inconvenience asserted by plaintiff is insufficient for a due process claim, especially considering that Sangamon County is only one hour further, that this case will almost certainly be resolved without trial, and that remote appearances are possible. We recognize that the Attorney General could also appear remotely, but the government's interest extends beyond the convenience of appearing in

- 11 -

particular courtrooms, as it seeks to more efficiently handle the type of constitutional case that plaintiff has filed here. Further, the parties are not starting off on an equal footing in the balancing test because the legislature has the power to determine venue (*Mapes*, 363 Ill. at 230) and we generally do not "interfere with the legislature's province in determining where venue is proper" (*Williams*, 139 Ill. 2d at 41).

¶ 27     *Williams* is readily distinguishable from the instant action and does not support a different outcome. *Williams* involved indigent defendants who were being forced into litigation, whereas plaintiff is a business entity bringing an action against the State. For all practical purposes, the students could not appear in Cook County (*id.* at 47), as opposed to plaintiff, whose attorney has already traveled to Sangamon County for oral argument before this court. *Williams* had the added considerations of an agency's lack of good faith in settling cases with student borrowers and its pursuit of default judgments (*id.* at 63), with no equivalent circumstances present here. Furthermore, *Williams* predated the technological advances that have led to the adoption and widespread use of remote court proceedings. The situation in *Williams* "effectively deprived [the students] of any meaningful opportunity to be heard in a court of law." *Id.* at 67. Here, in contrast, though litigating in Sangamon County may be less convenient for plaintiff than litigating in Madison County, it clearly does not rise to the level of an unconstitutional deprivation of due process.

¶ 28                                III. CONCLUSION

¶ 29     For the reasons stated, we reverse the circuit court's grant of summary judgment for plaintiff.

¶ 30     Circuit court judgment reversed.

¶ 31     Cause remanded.

¶ 32     JUSTICE HOLDER WHITE, specially concurring:

¶ 33     While the majority properly analyzes and finds section 2-101.5 of the Code of Civil Procedure (Pub. Act 103-5, § 2 (eff. June 6, 2023) (adding 735 ILCS 5/2-

101.5)) is not unconstitutional as applied to plaintiff (*supra* ¶ 26), I feel compelled to address the dissent's finding section 2-101.5 unconstitutional under the three-readings rule. In support of that finding, the dissent extols my dissent in *Caulkins v. Pritzker*, 2023 IL 129453, ¶¶ 84-114 (Holder White, J., dissenting, joined by Overstreet, J.). However, unlike in *Caulkins*, in this case, the three-readings rule and its enforcement are not properly before the court.

¶ 34    The dissent notes that "[i]t is well established that this court may affirm the circuit court's judgment on any basis in the record." *Infra* ¶ 59. However, in the circuit court, plaintiff itself acknowledged this court's precedent following the enrolled-bill doctrine foreclosed a three-readings rule challenge to the bill enacting section 2-101.5. The circuit court agreed and denied plaintiff's three-readings rule challenge. Thus, under existing supreme court case law, the circuit court's finding of unconstitutionality cannot be affirmed based only on the record before this court and the three readings rule. As explained below, the dissent is raising a challenge to existing precedent from this court, agreeing with that challenge, and declaring it provides another basis for finding the venue statute unconstitutional. That course of action is not the same as affirming a circuit court's judgment on any grounds that the record supports.

¶ 35    When denying the three-readings rule challenge, the circuit court did note "it is clear that Plaintiff intends to challenge existing law at a higher court." However, before this court, plaintiff expressly stated in its brief that the three-readings rule was not before this court and raised no arguments challenging the enrolled-bill doctrine. Thus, plaintiff forfeited any challenge to the enrolled-bill doctrine. See *People v. Griffin*, 2024 IL 128587, ¶ 70 (noting that this court has repeatedly held that a party's failure to argue a matter in its brief results in the forfeiture of the issue). Accordingly, the dissent raises a forfeited issue that plaintiff expressly chose not to present to this court.

¶ 36    In *Caulkins*, 2023 IL 129453, ¶ 89, the plaintiffs argued the three-readings rule provided an independent basis for affirming the circuit court's judgment. In their reply brief, the defendants asserted no violation of the three-readings rule occurred and the enrolled-bill doctrine foreclosed the plaintiffs' challenge. *Id.* The defendants also addressed the three-readings rule and the enrolled-bill doctrine in their oral argument to this court. *Id.* That situation is distinguishable from this case,

where plaintiff expressly limited the appeal to whether section 2-101.5 violated its due process rights. As such, the Attorney General never had an opportunity to respond to a three-readings rule challenge in his reply brief, and the issue was not addressed at oral argument. Under these circumstances, my dissent in *Caulkins*, by which I stand, is inapplicable to this appeal.

¶ 37    JUSTICE OVERSTREET, dissenting:

¶ 38    I disagree with the majority's conclusions and would affirm the circuit court's judgment finding section 2-101.5 of the Code of Civil Procedure (Code) (Pub. Act 103-5, § 2 (eff. June 6, 2023) (adding 735 ILCS 5/2-101.5) unconstitutional. Pursuant to section 2-101.5, the legislature has created additional burdens for Illinois claimants, some of whom are impoverished, to prevent their meaningful access to Illinois courts to protect their fundamental constitutional rights against state statutes, rules, and executive orders. See *id.* (actions seeking declaratory or injunctive relief against any state statute, rule, or executive order based on a violation of the state or federal constitution are proper only in Sangamon and Cook Counties, and the showing that another forum is much more convenient pursuant to *forum non conveniens* will not be recognized). As such, section 2-101.5 should be struck down in its entirety, as it violates the Illinois and United States Constitutions. See U.S. Const., amend. V (no person shall "be deprived of life, liberty, or property, without due process of law"); *id.* amend. XIV; Ill. Const. 1970, art. I, § 2 ("[n]o person shall be deprived of life, liberty or property without due process of law"); *Wolff v. McDonnell*, 418 U.S. 539, 579 (1974) (right of access to the court is founded in due process principles and assures that no person will be denied opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights); *Central Illinois Public Service Co. v. Allianz Underwriters Insurance Co.*, 158 Ill. 2d 218, 225-26 (1994) (both Illinois and United States Constitutions require, at a minimum, that litigants have a full and fair opportunity to litigate an issue before being bound by a resolution of that issue); see also Ill. Const. 1970, art. I, § 12. Moreover, section 2-101.5 of the Code is unconstitutional and void in its entirety because it was passed without compliance with the required three-readings rule of the Illinois Constitution (*id.* art. IV, § 8(d)).

¶ 39                                    Access to Courts

¶ 40          Section 12 of the Illinois Constitution provides:

> "Every person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his person, privacy, property or reputation. He shall obtain justice by law, freely, completely, and promptly." *Id.* art I, § 12.

¶ 41          "Provisions similar to article I, section 12, of the Illinois Constitution of 1970 were contained in the constitutions of 1870 (Ill. Const. 1870, art. II, § 19), 1848 (Ill. Const. 1848, art. XIII, § 12), and 1818 (Ill. Const. 1818, art. VIII, § 12))." *Walker v. Chasteen*, 2021 IL 126086, ¶ 33. "That every wrong shall have a remedy and that justice shall be obtained by law, freely, completely, and promptly have long been foundational principles in English and American jurisprudence." *Id.* "These principles date back more than 800 years to article 40 of the Magna Carta of 1215: 'To no one will we sell, to no one will we refuse or delay, right or justice.' Magna Carta 1215, 17 John, art. 40." *Id.*

¶ 42          Contrary to these foundational principles, section 2-101.5 denies and delays justice for those whose fundamental constitutional rights have been infringed outside of Cook and Sangamon Counties. In this case, plaintiff sought declaratory and injunctive relief in its local courthouse, outside of Cook and Sangamon Counties, contending that section 2BBBB of the Consumer Fraud and Deceptive Business Practices Act (commonly known as the Firearm Industry Responsibility Act) (Act) (Pub. Act 103-559, § 5 (eff. Aug. 14, 2023) (adding 815 ILCS 505/2BBBB)) violated its constitutional rights, including its fundamental second amendment right to keep and bear arms (U.S. Const., amend. II; Ill. Const. 1970, art. I, § 22). Plaintiff filed its action where it was damaged and where the Act will be enforced against it. Yet, the legislature and the majority will not allow it.

¶ 43          Section 2-101.5 affects only those claimants incurring constitutional infractions caused by state statute, rule, or executive order outside of Sangamon and Cook County. The general venue statute already provides that Sangamon or Cook County is a proper venue for those whose constitutional rights have been affected within those two counties. See 735 ILCS 5/2-101 (West 2022) (general venue statute provides that venue is proper in a civil case in the county in which "the transaction

or some part thereof occurred out of which the cause of action arose"). Thus, section 2-101.5 did not alter venue provisions for claimants asserting constitutional infringements occurring in Cook or Sangamon Counties. Instead, section 2-101.5 of the Code targets Illinoisans incurring violations of their constitutional rights outside of Sangamon and Cook Counties and loads them with additional burdens, including the time, inconvenience, and costs of travel, to prevent them from asserting their fundamental constitutional rights against State action.

¶ 44                    *Williams v. Illinois State Scholarship Comm'n*

¶ 45        In *Williams v. Illinois State Scholarship Comm'n*, 139 Ill. 2d 24, 42 (1990), this court addressed facts similar to this case when it determined that the venue statute favoring Cook County for loan default actions was an arbitrary and unreasonable statute violating due process guarantees. This court in *Williams* held that the Cook County venue statute effectively deprived class members of any " 'meaningful opportunity' " to defend themselves against the actions. *Id.* at 43. This court in *Williams* recognized that due process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims through the judicial process must be given meaningful opportunities to be heard. *Id.*; see *Boddie v. Connecticut*, 401 U.S. 371, 376 (1971) (when a judicial proceeding becomes the only effective means of resolving the dispute at hand, denial of full access to that process raises grave problems for its legitimacy); *Chambers v. Baltimore & Ohio R.R. Co.*, 207 U.S. 142, 148-49 (1907) (the right to sue and defend in the courts is foundational in our governmental system so that a state law restricting access to courts "must operate in the same way on its own citizens and those of other States"); *Sanders v. St. Louis County*, 724 F.2d 665, 666 (8th Cir. 1983) (*per curiam*) (an individual's constitutional right of access to the courts cannot be impaired, either directly or indirectly, by a retaliatory act intended to limit the individual's right of access). This court in *Williams* held that it was not just the arbitrariness of establishing venue in Cook County that infringed upon the plaintiffs' rights of access to the courts but that the Cook County venue statute effectively denied the class members, some of whom were impoverished with little means to travel, full access to the legal process, raising " 'grave problems' " for the statute's legitimacy. *Williams*, 139 Ill. 2d at 45 (quoting *Boddie*, 401 U.S. at 376).

¶ 46　　Following this court's precedent in *Williams*, 139 Ill. 2d at 28, 63, and the *Mathews* factors (*Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)) applied there, I would conclude that the Cook/Sangamon County venue statute in this case is arbitrary and unreasonable, effectively deprives plaintiff of its right to meaningful access to the legal process, and violates due process. The private interest affected by the official action here (*id.* at 335) involves not only choice of venue but the assertion of fundamental constitutional rights against state oppression. See Pub. Act 103-5, § 2 (eff. June 6, 2023) (adding 735 ILCS 5/2-101.5(a)) (Cook or Sangamon County venue mandated for resolution of whether state statute, rule, or executive order violated "the Constitution of the State of Illinois or the Constitution of the United States").

¶ 47　　Section 2-101.5 seeks to deprive claimants outside of Cook and Sangamon Counties of their right to assert constitutional infringement. They will incur additional travel and expense burdens not borne by those incurring constitutional infringements within Cook or Sangamon County. Pursuant to section 2-101.5, out of the state's 102 counties, 100 are excluded from hearing constitutional claims against a state law, rule, or executive order. The greater the distance between the parties, witnesses, and sources of evidence, the more arduous it becomes for claimants outside Sangamon and Cook Counties to assert their fundamental constitutional protections against oppressive statutes.

¶ 48　　Couching this issue in terms of mere venue choice, the majority conveniently ignores the statute's clear attempt to silence the assertion of fundamental constitutional rights by citizens incurring violations outside of Sangaman and Cook Counties. See generally *Cotting v. Kansas City Stock Yards Co.*, 183 U.S. 79, 106 (1901) (fourteenth amendment undoubtedly intended that equal protection and security be given to all under like circumstances, including that they should have like access to the courts for the protection of their persons and property and the prevention and redress of wrongs); *People v. Alcozer*, 241 Ill. 2d 248, 263-64 (2011) (the avenues to assert constitutional infringement by a statute must be kept free of unreasoned distinctions that can only impede open and equal access to the courts). Limiting claims asserting fundamental constitutional rights to a distant, inconvenient forum runs the very real risk that these rights will be erroneously deprived. See *Williams*, 139 Ill. 2d at 48. Many affected by section 2-101.5 are of a different political affiliation than the General Assembly's majority and the

Governor, and the legislature's enactment here works to silence them, along with all other claimants residing outside of the legislature's chosen forums.

¶ 49    To be sure, the risk of erroneous deprivation of the right to access the courts in defense of constitutional protections is substantial. In *Williams*, 139 Ill. 2d at 44, this court recognized that, even though prior cases framed the right of meaningful access to the courts in terms of a plaintiff's right, the source of the right of meaningful access to the courts should be broadly interpreted to include a defendant's or plaintiff's due process rights because "[d]epriving a litigant of the opportunity to use the courts effectively makes these legal rights worthless." Accordingly, I would reject the State's attempt to distinguish *Williams* on the basis of which party is seeking access to the courts in vindication of its rights. This is especially true when a plaintiff seeks meaningful access to the court to assert fundamental constitutional protections.

¶ 50    The majority finds that claimants incurring alleged constitutional violations outside Cook and Sangamon Counties may simply assert their claims by appearing and presenting their witnesses and documents to Cook or Sangamon County courts through remote means. *Supra* ¶ 23. Yet, as noted by the circuit court, the State, with its attorney general offices throughout Illinois, is more equipped to participate in outlying counties using remote technology. The attorney general's office often appears in the circuit court remotely, but not all persons in the outlying counties have the same equipment or subscriptions to do so.

¶ 51    Moreover, remote appearances do not equate to in-person appearances. See Ill. S. Ct. R. 45(c) (eff. Jan. 1, 2023) (making exception to remote appearances for certain types of proceedings such as evidentiary hearings and trials); R. 241(b) (eff. Feb. 2, 2023) (good cause and appropriate safeguards must be present for judge to allow case participant to testify by video conference). The availability of remote appearances does not discount the impediments created by the legislature against those outside of Sangamon and Cook Counties asserting their constitutional rights against state enactments. Section 2-101.5 effectively exposes those asserting claims of constitutional magnitude occurring outside of Sangamon and Cook Counties to incur costly hurdles in asserting their rights because the legislature has placed venue in a faraway place where they neither reside nor carry on activities. See *Williams*, 139 Ill. 2d at 58.

- 18 -

¶ 52    The implications of depriving claimants of reasonable access to the courts to assert their fundamental constitutional rights are undeniable. Pursuant to the majority's conclusion, the legislature succeeds in chilling the constitutional claims of many impoverished citizens located outside of Cook and Sangamon Counties. See Ill. Comm'n on Poverty Elimination & Econ. Sec., *All in Illinois: A Five-Year Strategy to Reduce Deep and Persistent Poverty* (Mar. 2022), https://www.dhs. state.il.us/OneNetLibrary/27897/documents/CPEES/Poverty-Commission-Strategic-Plan-Brief-2022.pdf [https://perma.cc/F7JF-WLKF] (Illinois counties with highest percentages experiencing extreme poverty are located outside of Sangamon and Cook Counties).

¶ 53    For many of these residents, especially those residing in rural areas that lack resources to assist them, the drive to a Sangamon or Cook County courthouse is a major obstacle. For example, the relative drive for an Alexander County, Illinois, resident to access the court in Sangamon County is 238 miles, almost four hours each way, and the drive to Cook County is 395 miles, almost six hours each way. See Driving Directions From Alexander County Courthouse to Sangamon County Circuit Clerk's Office, Google Maps, https://www.google.com/maps (last visited Mar. 14, 2025) [https://perma.cc/ZPB7-A4TJ]; Driving Directions From Alexander County Courthouse to Cook County Circuit Court, Google Maps, https://www. google.com/maps (last visited Mar. 14, 2025) [https://perma.cc/M7AP-3ZLW]. Thus, the average cost to access the closest court for those incurring constitutional violations in Alexander County is anywhere from $59.98 (considering an average car drives 25 miles per gallon, average price of gas per gallon is $3.15 (U.S. Dep't of Energy & U.S. Env't Prot. Agency, *Fuel Economy Guide, Model Year 2024* (Feb. 19, 2025), https://www.fueleconomy.gov/feg//pdfs/guides/FEG2024.pdf [https:// perma.cc/5NNH-3FBD]), and the car drives 238 miles each way) to $276.08 (considering the United States Department of Energy's calculation that auto travel costs $0.58 per mile (Cost Per Mile of Driving Calculator, Calculator Acad. Team, https://calculator.academy/cost-per-mile-of-driving-calculator/ (last visited Mar. 14, 2025) [https://perma.cc/3QMK-4B4G]). See Standard Mileage Rates, Internal Revenue Serv., https://www.irs.gov/tax-professionals/standard-mileage-rates (Jan. 2, 2025) [https://perma.cc/5YGH-X26C] (business use mileage rate of $0.70 per mile). The venue established by the State pursuant to section 2-101.5 imposes an unreasonable travel and cost burden, violating the right to access the courts for constitutional guarantees. See *Walker*, 2021 IL 126086, ¶ 43 ($50 filing fee was a

litigation tax with no direct relation to expenses of litigation or services rendered and, as such, was facially unconstitutional because $50 fee unreasonably interfered with foreclosure litigants' access to the courts). The right to be heard on fundamental constitutional claims becomes a meaningless promise to the poor. See *Griffin v. Illinois*, 351 U.S. 12, 17 (1956). Yet the legislature provided no safeguard to protect these residents from the arbitrary denial of their right of meaningful access to the court to assert their fundamental constitutional rights. See *Williams*, 139 Ill. 2d at 50. If the right to obtain justice freely is to be a meaningful guarantee, this statute cannot stand. See *Walker*, 2021 IL 126086, ¶ 43.

¶ 54    Moreover, there is no countervailing state interest of overriding significance. See *Boddie*, 401 U.S. at 377 ("due process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard" and that " '[w]herever one is assailed in his person or his property, there he may defend,' *Windsor v. McVeigh*, 93 U.S. 274, 277 (1876)"). Pursuant to section 2-101.5, the legislature has exempted constitutional assertions from the general venue statute and from the statutory and *forum non conveniens* protections allowing for transfer or dismissal when venue is improper. Indeed, it seems the legislature's interest here is to protect its legislation from constitutional challenges, which is not a reasonable or appropriate interest of the legislative branch.

¶ 55    The State's asserted purposes of consolidation and efficiency are not compelling. As noted by the circuit court, the attorney general has satellite offices throughout Illinois and routinely litigates in every county in Illinois. Each of the attorney general's local offices is already familiar with local rules and procedures. *Williams*, 139 Ill. 2d at 62-63. Any argument to the contrary, *i.e.*, that requiring the State to answer in counties other than Sangamon or Cook Counties is a gross inconvenience, is untenable. *Id.* at 63. Indeed, the majority concedes that "the State's interest is not extremely strong given that the attorney general's office was previously able to manage the litigation under general venue principles." *Supra* ¶ 25; see *Williams*, 139 Ill. 2d at 60. While it is arguably more efficient and less expensive for the State to respond to constitutional challenges in one of two venues, the added administrative burden requiring the State to answer in counties where its agents are located and capable is negligible. *Id.*

¶ 56     These factors, considered against the weight of the State's interest in blatant forum shopping to limit assertions of fundamental constitutional rights against its legislation, renders the venue provision unconstitutional. The due process clause prevents the State from unreasonably closing the courthouse doors to litigants with a viable claim for relief. *Lewis v. Casey*, 518 U.S. 343, 350 (1996); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 437 (1982); *Boddie*, 401 U.S. at 382-83; *Williams*, 139 Ill. 2d at 63. Section 2-101.5 requires an otherwise-inappropriate forum for claimants incurring constitutional violations outside Sangamon and Cook Counties; creates additional travel and cost obstacles for claimants, including plaintiff, to assert their fundamental constitutional rights, thereby denying their meaningful access to the courts; and should be struck down in its entirety. Despite the majority's conclusion to the contrary, section 2-101.5 of the Code fails to meet the fundamental requirements of due process. See *Williams*, 139 Ill. 2d at 63.

¶ 57     The legislature, Governor, and majority have hereby rendered many Illinoisians less capable to combat oppression against their freedom of speech (U.S. Const., amends. I, XIV; Ill. Const. 1970, art. I, § 4), freedom of religion (U.S. Const., amends. I, XIV; Ill. Const. 1970, art. I, § 3), freedom to assemble and petition (U.S. Const., amends. I, XIV; Ill. Const. 1970, art. I, § 5), and right to keep and bear arms (U.S. Const., amends. II, XIV; Ill. Const. 1970, art. I, § 22), among many other rights and freedoms. See generally U.S. Const., amend. XIV, § 1 (due process and equal protection); Ill. Const. 1970, art. I, § 2 (same); U.S. Const., amends. V, XIV (prohibition against taking or damaging private property for public use without just compensation); Ill. Const. 1970, art. I, § 15 (same); Ill. Const. 1970, art. IV, § 13 (prohibition against special legislation, wherein the state statute, rule, or order confers a special benefit or privilege upon one person or group and excludes others similarly situated). On the aforementioned basis alone, this statute is unconstitutional and should not stand.

¶ 58                    Three Readings Rule of the Illinois Constitution

¶ 59     Nevertheless, as an alternative basis for affirming the circuit court's judgment, I would find section 2-101.5 unconstitutional pursuant to article IV, section 8, of the Illinois Constitution (Ill. Const. 1970, art. IV, § 8). It is well established that this court may affirm the circuit court's judgment on any basis in the record. *Ultsch*

*v. Illinois Municipal Retirement Fund*, 226 Ill. 2d 169, 192 (2007); see *Material Service Corp. v. Department of Revenue*, 98 Ill. 2d 382, 387 (1983) (stating "[i]t is the judgment and not what else may have been said by the lower court that is on appeal to a court of review"). Indeed, "this court may affirm a trial court's judgment on any grounds which the record supports even if those grounds were not argued by the parties." *In re Detention of Stanbridge*, 2012 IL 112337, ¶ 74; see *Studt v. Sherman Health Systems*, 2011 IL 108182, ¶ 48 (Karmeier, J., specially concurring) (finding no forfeiture because it is well established that a reviewing court "may affirm a trial court's judgment on any grounds which the record supports [citation], even where those grounds were not argued by the parties [citation]"); *Tuna v. Wisner*, 2023 IL App (1st) 211327, ¶ 54 (same); *People v. Ferrell*, 2023 IL App (3d) 220292, ¶ 39 (same); *In re Marriage of Solecki*, 2020 IL App (2d) 190381, ¶ 74 (same); *Developers Surety & Indemnity Co. v. Lipinski*, 2017 IL App (1st) 152658, ¶ 27 (same); *Mack Industries, Ltd. v. Village of Dolton*, 2015 IL App (1st) 133620, ¶ 37 n.7 (same); *Nuzzi v. Board of Trustees of the Teachers' Retirement System,* 2015 IL App (4th) 140401, ¶ 34 (same); *Currie v. Wisconsin Central, Ltd.*, 2011 IL App (1st) 103095, ¶ 31 (same); *Cuellar v. Hout*, 168 Ill. App. 3d 416, 425 (1988) (same); *Ogden Group, Inc. v. Spivak*, 92 Ill. App. 3d 932, 934 (1981) (same); *Redd v. Woodford County Swine Breeders, Inc.*, 54 Ill. App. 3d 562, 565 (1977) (same); *Collins v. Towle*, 3 Ill. App. 3d 753, 757 (1972) (same).

¶ 60 In this case, plaintiff asserted in its response to the State's motion to transfer venue and for summary judgment that section 2-101.5 is invalid as violating the three-readings rule of the Illinois Constitution (Ill. Const. 1970, art. IV, § 8(d)). In its order finding section 2-101.5 unconstitutional, the circuit court denied relief on the three-readings rule, stating it was bound by the enrolled-bill doctrine to ignore the constitutional violation. See *Friends of the Parks v. Chicago Park District*, 203 Ill. 2d 312, 328-29 (2003) (once the Speaker of the House of Representatives and the President of the Senate certify that procedural requirements for passing a bill have been met, bill is presumed to have met all procedural requirements for passage). I would no longer bind circuit courts to ignore constitutional violations of the three-readings rule and would instead affirm the circuit court's judgment on the alternative basis that section 2-101.5 of the Code violates the three-readings rule of article IV, section 8(d), of the Illinois Constitution (Ill. Const. 1970, art. IV, § 8(d)).

¶ 61    Article IV, section 8, of the Illinois Constitution sets forth the requirements for the passage of bills in the legislature. Section 8(d) states as follows:

> "(d) A bill shall be read by title on three different days in each house. A bill and each amendment thereto shall be reproduced and placed on the desk of each member before final passage.
>
> Bills, except bills for appropriations and for the codification, revision or rearrangement of laws, shall be confined to one subject. Appropriation bills shall be limited to the subject of appropriations.
>
> A bill expressly amending a law shall set forth completely the sections amended.
>
> The Speaker of the House of Representatives and the President of the Senate shall sign each bill that passes both houses to certify that the procedural requirements for passage have been met." *Id.*

Although this court has historically followed the enrolled-bill doctrine (*Friends of the Parks*, 203 Ill. 2d at 328-29), I continue to agree with Justice Holder White's dissenting opinion in *Caulkins v. Pritzker*, 2023 IL 129453, ¶ 95 (Holder White, J., dissenting, joined by Overstreet, J.), and Justice Heiple's dissent in *People v. Dunigan*, 165 Ill. 2d 235, 257-58 (1995) (Heiple, J., concurring in part and dissenting in part):

> " 'The interpretation of a constitutional provision depends, in the first instance, on the plain meaning of its language. Next, it depends on the common understanding of the citizens who, by ratifying the constitution, have given it life. A court looks to the debates of the convention delegates only when a constitutional provision is ambiguous. (*Kalodimos v. Village of Morton Grove* (1984), 103 Ill. 2d 483, 492-93). There is no ambiguity in the provision requiring the legislature to read a bill on three different days in each house, the provision that a bill receive a majority vote in each house, or the provision requiring the Speaker of the House and the President of the Senate to sign each bill to certify that the procedural requirements for passage have been met.

- 23 -

If it were deemed desirable to foreclose inquiries into the regularity of the passage of bills, language similar to the enrolled-bill doctrine could have been included within the constitution. There is no such language. Moreover, the Illinois Constitution was adopted at a referendum. It did not become the law of the State by either the discussions of the delegates or by their votes. The constitutional convention merely submitted the document to the public for a vote. There is no way that a voter could interpret the language of the constitution to mean that procedural requirements for the passage of a bill could be overridden by the signatures of two State officers. In truth, the signatures of the officers are merely *prima facie* evidence that the General Assembly has abided by the requirements of the constitution. In other words, it raises a rebuttable presumption that the requirements for passage have been met.

A literal adherence to this so-called enrolled-bill doctrine means that a bill need never be read or presented in either house, need never receive a majority vote, and need never even be voted on. Two people, the Speaker of the House and the President of the Senate, need merely sign and certify a bill and, unless vetoed by the Governor pursuant to article IV, section 9, the bill becomes *ipso facto* the law of Illinois. [However,] the constitutional requirements for the enactment of a bill should be followed and enforced. While separation of powers is a valid doctrine and a presumption of legislative regularity is its proper corollary, this court should reserve the right of review to ensure the General Assembly's compliance with constitutional mandates.' " *Caulkins*, 2023 IL 129453, ¶ 95 (quoting *Dunigan*, 165 Ill. 2d at 257-58).

¶ 62   In *Caulkins*, Justice Holder White, in a dissent that I joined, also recognized that since *Dunigan* this court has noted the legislature has " 'shown remarkably poor self discipline in policing itself in regard to the three-readings requirement.' " *Id.* ¶ 96 (quoting *Friends of the Parks*, 203 Ill. 2d at 329, and citing *Geja's Cafe v. Metropolitan Pier & Exposition Authority*, 153 Ill. 2d 239, 260 (1992) (noting that "ignoring the three-readings requirement has become a procedural regularity"), and *Cutinello v. Whitley*, 161 Ill. 2d 409, 425 (1994)). The *Caulkins* dissent also noted "[t]hat lack of legislative self-discipline continues to this day." *Id.* (citing *Orr v.*

- 24 -

*Edgar*, 298 Ill. App. 3d 432, 447 (1998) (leaving to this court "the issue of whether the state legislature may disregard constitutional requirements and maintain the legality of its actions under the auspices of the enrolled bill doctrine"), *New Heights Recovery & Power, LLC v. Bower*, 347 Ill. App. 3d 89, 100 (2004), *McGinley v. Madigan*, 366 Ill. App. 3d 974, 992 (2006), *Doe v. Lyft, Inc.*, 2020 IL App (1st) 191328, ¶¶ 51-55, *Accuracy Firearms, LLC v. Pritzker*, 2023 IL App (5th) 230035, ¶¶ 36-46, *First Midwest Bank v. Rossi*, 2023 IL App (4th) 220643, ¶¶ 220-41, and *Rowe v. Raoul*, 2023 IL 129248, ¶ 8 (noting the plaintiffs raised a three-readings rule claim in the circuit court)).

¶ 63        Because I continue to wholeheartedly agree with the dissenting opinion in *Caulkins*, I restate its compelling analysis here:

"In *Friends of the Parks*, 203 Ill. 2d at 329, this court noted it is 'ever mindful of its duty to enforce the constitution of this state' and 'urge[d] the legislature to follow the three-readings rule.' The court went on to state that, '[w]hile separation of powers concerns militate in favor of the enrolled-bill doctrine [citation], our responsibility to ensure obedience to the constitution remains an equally important concern.' *Id.*; see also *Field v. Clark*, 143 U.S. 649, 670 (1892) (stating it is 'the duty of this court, from the performance of which it may not shrink, to give full effect to the provisions of the Constitution relating to the enactment of laws'). In *Geja's Cafe*, 153 Ill. 2d at 260, this court declined the invitation to abandon the enrolled-bill doctrine, feeling 'the doctrine of separation of powers is more compelling.' However, this court deferred to the legislature 'hesitantly' and 'reserve[d] the right to revisit this issue on another day to decide the continued propriety of ignoring this constitutional violation.' *Id.*

*** *Accuracy Firearms* [also] addressed the serious concerns raised by the plaintiffs there as to the legislature's repeated failure to adhere to the requirements of article IV, section 8(d), and the three-readings rule.

'Unfortunately, the Illinois Supreme Court's warnings regarding past legislative nonconformance with constitutional boundaries (see *Friends of the Parks*, 203 Ill. 2d at 328-29) appear to have gone unheeded and, instead, are now interpreted as the judiciary's

- 25 -

acceptance of, or the judiciary's acquiescence in, the legislature's continued failure to adhere to constitutional procedures when enacting legislation. While compliance with the enrolled-bill doctrine presumes the legislative procedure adhered to constitutional requirements (see *Geja's Cafe*, 153 Ill. 2d at 259), such presumption is readily overcome by evidence revealing the contrary posted on the General Assembly website.

We question the sagacity of continued adherence to the Illinois Supreme Court precedent in light of the legislature's continued blatant disregard of the court's warnings and the constitutional mandates. The three-reading requirement ensures that the legislature is fully aware of the contents of the bills upon which they will vote and allows the lawmakers to debate the legislation. Equally relevant to the three-reading rule is the opportunity for the public to view and read a bill prior to its passage, thereby allowing the public an opportunity to communicate either their concern or support for proposed legislation with their elected representatives and senators. Taken together, two foundations of the bedrock of democracy are decimated by failing to require the lawmakers to adhere to the constitutional principle.

To be sure, Illinois is not the only state that has faced or endured repeated ethical lapses associated with gut and replace legislation. However, other states have addressed this issue and demand compliance with the state constitutional mandates. See *Washington v. Department of Public Welfare of Pennsylvania*, 188 A.3d 1135 (Pa. 2018); *State ex rel. Ohio AFL-CIO v. Voinovich*, 69 Ohio St. 3d 225, 1994-Ohio-1, 631 N.E.2d 582; *Bevin v. Commonwealth ex rel. Beshear*, 563 S.W.3d 74 (Ky. 2018); *League of Women Voters of Honolulu v. State*, 499 P.3d 382 (Haw. 2021).

Our lawmakers take an oath of office to " 'support the constitution of the United States, and the constitution of the state of Illinois.' " 25 ILCS 5/2 (West 2020); Ill. Const. 1970, art. XIII, § 3. The same is required for the circuit court judiciary (705 ILCS 35/2

(West 2020)) as well as the appellate and supreme courts and certain members of the executive branch (Ill. Const. 1970, art. XIII, § 3). Allowing lawmakers to continue to ignore constitutional mandates under the enrolled-bill doctrine, knowing full well the constitutional requirements were not met, belittles the language of the oaths, ignores the need for transparency in government, and undermines the language of this state's constitution.' *Accuracy Firearms*, 2023 IL App (5th) 230035, ¶¶ 42-45.

Given the legislature's repeated failures, continued adherence to the enrolled-bill doctrine should no longer be countenanced. The doctrine 'is contrary to modern legal thinking, which does not favor conclusive presumptions that may produce results which do not accord with fact.' *Association of Texas Professional Educators v. Kirby*, 788 S.W.2d 827, 829 (Tex. 1990); *D&W Auto Supply v. Department of Revenue*, 602 S.W.2d 420, 424 (Ky. 1980) (stating the doctrine 'frequently *** produces results which do not accord with facts or constitutional provisions'). Moreover, '[t]he rule disregards the primary obligation of the courts to seek the truth and to provide a remedy for a wrong committed by any branch of government.' *D&W Auto Supply*, 602 S.W.2d at 424.

Although this court has, in the past, found separation of powers to be a reason to decline abandoning the doctrine, it has not found it to be an absolute bar. This court has repeatedly reminded the legislature that it must comply with the bill-passage requirements of the constitution and, if it does not, this court reserves the right to act.

No doctrine can exempt from judicial review the requirements of the constitution. 'It is emphatically the province and duty of the judicial department to say what the law is.' *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

   ' "We may not abdicate this responsibility under the guise of our deference to a co-equal branch of government. While it is appropriate to give due deference to a co-equal branch of government as long as it is functioning within constitutional

constraints, it would be a serious dereliction on our part to deliberately ignore a clear constitutional violation." ' *City of Philadelphia v. Commonwealth*, 838 A.2d 566, 581 (Pa. 2003) (quoting *Consumer Party of Pennsylvania v. Commonwealth*, 507 A.2d 323, 333 (Pa. 1986)).

See also *D&W Auto Supply*, 602 S.W.2d at 424 (disagreeing with 'the premise that the equality of the various branches of government requires that we shut our eyes to constitutional failings and other errors of our coparceners in government').

This court cannot cede the constitutionality of a statute to the Speaker of the House of Representatives and the President of the Senate. To turn a blind eye to repeated violations of the constitution suggests 'that the courts must perpetually remain in ignorance of what everybody else in the state knows.' *Power, Inc. v. Huntley*, 235 P.2d 173, 181 (Wash. 1951) (*en banc*); see also *D&W Auto Supply*, 602 S.W.2d at 423 ('To countenance an artificial rule of law that silences our voices when confronted with violations of our constitution is not acceptable to this court.').

As Justice Heiple suggested and as other courts have advocated, 'the signatures of the officers are merely *prima facie* evidence that the General Assembly has abided by the requirements of the constitution. In other words, it raises a rebuttable presumption that the requirements for passage have been met.' *Dunigan*, 165 Ill. 2d at 258 (Heiple, J., concurring in part and dissenting in part); *Association of Texas Professional Educators*, 788 S.W.2d at 829 (stating 'the present tendency favors giving the enrolled version only prima facie presumptive validity, and a majority of states recognize exceptions to the enrolled bill rule'). That 'presumption may be overcome by clear, satisfactory and convincing evidence establishing that constitutional requirements have not been met.' *D&W Auto Supply*, 602 S.W.2d at 425." *Id.* ¶¶ 97-103.

¶ 64    Like the dissent in *Caulkins*, taking judicial notice of the history of the legislation on the General Assembly's website, I would find the presumption,

created by the signatures of the Speaker of the House of Representatives and the President of the Senate, that the General Assembly abided by the three-readings requirement of the Illinois Constitution is clearly overcome in this case. See *id.* ¶ 103; *Dunigan*, 165 Ill. 2d at 258; see also *Board of Education of Richland School District No. 88A v. City of Crest Hill*, 2021 IL 126444, ¶ 5 (" 'Illinois courts often take judicial notice of facts that are readily verifiable for referring to sources of indisputable accuracy' such as court records or public documents, including records on [a] government website" (quoting *People v. Johnson*, 2021 IL 125738, ¶ 54)).

¶ 65    In this case, as noted by the circuit court, House Bill 3062 (HB 3062) (103d Ill. Gen. Assem., House Bill 3062, 2023 Sess.) was first introduced in the Illinois House of Representatives on February 16, 2023, as a Landlord and Tenant Act amendment (see 765 ILCS 705/0.01 *et seq* (West 2020)), involving reusable tenant screening reports, and passed the House as a landlord-tenant bill. However, the Senate, after the second reading in April 2023, amended the bill by striking all reference to landlord-tenant law and replacing it with the venue provision at issue here. 103d Ill. Gen. Assem., House Bill 3062, 2023 Sess. In its new form, HB 3062 was presented in the Senate and passed on a "third reading" with 37 yeas and 16 nays. *Id.*

¶ 66    In its new form, HB 3062 was sent back to the House on May 19, 2023. HB 3062, as amended, was not read three times prior to voting on the bill. On May 25, 2023, the House voted to concur with the Senate's amendment with 69 yeas and 35 nays. That same day, the Speaker of the House of Representatives and the President of the Senate certified that the procedural requirements of the constitution had been met, and the Governor signed the bill into law on June 6, 2023. *Id.* Once "gutted and amended," the venue bill herein was not read three times in the Senate or three times in the House.

¶ 67    Thus, the venue provision of section 2-101.5 of the Code was clearly not before the House or the Senate on three different days in each house. As noted previously in the dissenting opinion of *Caulkins*:

> " '[T]he three readings requirement serves three important purposes: it (1) provides the opportunity for full debate on proposed legislation; (2) ensures that members of each legislative house are familiar with a bill's contents and have time to give sufficient

consideration to its effects; and (3) provides the public with notice and an opportunity to comment on proposed legislation.' *League of Women Voters of Honolulu v. State*, 499 P.3d 382, 396 (Haw. 2021).

See also *Schwegmann Brothers v. Calvert Distillers Corp.*, 341 U.S. 384, 396 (1951) (Jackson, J., concurring, joined by Minton, J.) (noting the three-readings requirement is intended 'to make sure that each House knows what it is passing and passes what it wants'). On the contrary, the practice of gutting and replacing legislation 'discourages public confidence and participation,' 'deprives the public of notice,' and 'is antithetical to the intent of the three readings requirement.' *League of Women Voters*, 499 P.3d at 405." *Caulkins*, 2023 IL 129453, ¶ 109.

¶ 68    In this case, the landlord-tenant bill that received votes on three different days in the House in February 2023 was in no way the venue bill that passed the House on one vote in May 2023. The State's suggestion in this case that simply reading the title of a completely different bill on three different days "suffices to pass constitutional muster is an affront to the people of this state and renders the three-readings requirement essentially meaningless." *Id.* ¶ 110. "No such conclusion— whether expressed or implied—should receive the imprimatur of this court." *Id.* "[T]he people of Illinois deserve nothing less than the procedural requirements of the constitution be followed by their elected representatives and senators." *Id.* ¶ 112.

¶ 69    Because the procedural requirements of the constitution were not met in the passage of HB 3062, I would find the Act unconstitutional in its entirety on this alternative basis. Accordingly, because the circuit court's judgment of unconstitutionality is supported by the above analyses, I respectfully dissent.